

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

MKM:NEM                          *271 Cadman Plaza East*
F. #1995R01538                   *Brooklyn, New York 11201*

March 9, 2018

BY HAND DELIVERY AND ECF

The Honorable Frederic Block
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York   11201

> Re:   United States v. Frank Federico
>       Criminal Docket No. 95-31 (FB)

Dear Judge Block:

On February 21, 2017, the defendant Frank Federico requested early termination of supervised release pursuant to Title 18, United States Code, Section 3583(e)(1).   Federico alleges that early termination of supervised release is warranted because of his (1) good behavior; (2) compliance with his parole conditions; (3) completion of two years of supervised release; and (4) his ill health.   Federico's claims do not warrant early termination of supervised release, and accordingly this motion should be denied.

I.      Background

        A.      The Carting Cartel

Beginning in the late 1970s and continuing well into the 1980s, the Luchese Organized Crime Family (the "Luchese Family") controlled much of the garbage carting industry on Long Island.   Under what was known as the property-rights system, a specific garbage hauler "owned" each stop from which garbage was collected.   Attempting to underbid another carter was considered to be "stealing" his customer.   Garbage haulers colluded, submitting uniformly high price estimates to a customer.   The stop's owner would then offer a slightly lower estimate to win the contract—a practice better known as bid-rigging.

The Luchese Family used the Private Sanitation Industry Association ("PSIA"), an association of Long Island carting companies controlled by Luchese Family captain Salvatore Avellino and Luchese Family soldier Carmine Avellino, to enforce the property-

rights system.   (Presentence Investigation Report ("PSR") ¶¶ 7-8).   The "PSIA was the clearinghouse through which any transactions involving the Long Island carting industry, i.e., bids, pricing, etc., were approved or rejected by the Luchese Family.   In exchange for ensuring that a stop remained with a carter forever, and could not be stolen by a competing carter, PSIA and the Luchese Family received regular payments from the association's members and received a commission from the sale or trade of every stop."   (PSR ¶ 8).   The PSIA banned carters that refused to abide by their non-competitive rules.   Businesses that used non-PSIA carters were threatened and the equipment of carters that did business without PSIA endorsement was damaged.   (PSR ¶ 9).

### B.   The "Garbage War"

In 1980, Robert Kubecka and his father Jerome Kubecka owned a number of carting businesses on Long Island that were soon the victims of the Luchese Family's carting scheme.   In 1981, the Kubeckas and Robert's brother-in-law, Donald Barstow, "refused the demands of the PSIA and actively sought new business by competitively bidding for jobs and by soliciting business that were served by PSIA carters with lower rates."   (PSR ¶ 12).   The Kubeckas' actions resulted in the so-called "garbage wars," in which the Luchese Family attempted to "(1) stop the Kubeckas from soliciting garbage disposal contracts at stops already serviced by other carters; (2) force the Kubeckas to return or compensate other carters with the stops that the Kubeckas successfully solicited; and (3) coerce the Kubeckas to join the PSIA and the other carters in their bid-rigging scheme."   (PSR ¶ 13).

Members of the Luchese family threatened the Kubeckas with violence, damaged their equipment, and threatened and damaged businesses that the Kubeckas serviced. Other businesses only learned of the dispute after their storefront windows had been broken. Because of the threats and damage caused by the Luchese Family, the Kubeckas "(1) surrendered certain garbage stops in Nassau and Suffolk Counties to the PSIA carters; (2) refrained from bidding on a public disposal contract in Suffolk County; (3) surrendered garbage stops at the Cold Spring Harbor School District, and (4) agreed not to solicit certain garage disposal contracts."   (PSR ¶ 16).

### C.   Robert Kubecka and Donald Barstow's Cooperation

Following these concessions, the Kubeckas agreed to cooperate with the New York State Organized Crime Task Force.   Between 1982 and 1983, the Kubeckas taped PSIA members discussing bid-rigging.   Kubecka and Barstow also testified before a Suffolk County grand jury and before the New York State Supreme Court.   During one of these hearings, Luchese Family captain Salvatore Avellino's lawyer was present during questioning about Robert Kubecka's cooperation with law enforcement.   (PSR ¶¶ 17-18).

As a result of Kubecka's and Barstow's cooperation, Salvatore Avellino was arrested in 1984 and indicted on antitrust and bribery charges.   In 1986, Avellino pleaded guilty to coercion.   During his guilty plea allocution, Avellino stated that:

Between on or about December 1981 and October 1983, in the

2

> County of Suffolk, I Salvatore Avellino, intentionally and knowingly violated the law by inducing Robert Kubecka and Jerome Kubecka from refraining from bidding for and soliciting certain carting customers by instilling in the Kubeckas a fear that I would damage the Kubeckas' property.

(PSR ¶¶ 19-20).

Notwithstanding Avellino's guilty plea and other criminal and civil actions directed toward the Mafia's control of the carting industry, the Luchese Family continued to control the carting industry.  As such, in 1989 Robert Kubecka met with the United States Attorney's Office for the Eastern District of New York and agents from the Federal Bureau of Investigation ("FBI") and agreed to cooperate with federal authorities regarding the Luchese Family's anticompetitive actions in the carting industry.  (PSR ¶ 23).  Later that year, the then-largest civil RICO action was brought against, among others, the Luchese Family and Salvatore Avellino.   The complaint in that action named the Kubeckas and their companies as victims.   (PSR ¶ 25).

D.     The Murder of Robert Kubecka and Donald Barstow

On August 10, 1989, two months after the RICO suit was filed, and two weeks after Robert Kubecka testified about his cooperation with federal authorities in a deposition, Robert Kubecka and Donald Barstow were murdered inside the Kubecka company carting office.  (PSR ¶ 26).  Kubecka was 40 years old at the time of his death and Barstow was 35 years old.  Kubecka was survived by his wife and then-eight and six year old children. Barstow was survived by his wife and then-seven year old daughter.   Kubecka was shot in the chest and while mortally wounded called 911 for help as he sought cover in the office's bathroom.   An assailant fired five shots through the bathroom door.   Barstow, who had come to Kubeckas' aid after the struggle began, was shot four times but managed to injure one of his assailants during the attack.   Three blood types were recovered from the crime scene. One belonged to Kubecka, one belonged to Barstow and a third blood type was found in a trail of blood leading from the carting office out to the street.   (PSR ¶¶ 27-30).

E.     The Criminal Investigation and Prosecution

In 1992, Federico was personally served with a subpoena to appear before a federal grand jury to provide blood and hair samples.   After securing an adjournment of his appearance, Federico was scheduled to appear before the grand jury on March 9, 1993. Federico did not appear and the FBI was not able to locate him.   Mr. Murray Richman, Federico's attorney at the time, confirmed that Federico had been aware of his scheduled appearance.   An arrest warrant was issued for Federico's arrest in 1994, but remained a fugitive from justice for years.   While a fugitive, he fled the United States and lived in Italy. (PSR ¶ 78).

On February 17, 1994, Salvatore Avellino pleaded guilty to racketeering charges that included admissions as to his role in the Kubecka-Barstow murders.   Avellino admitted that

3

he had:

> conspired with various persons associated with the enterprise charged in count one [the Luchese Family], including Al D'Arco, to kill Robert [K]ubecka and Donald Barstow. For example, in one meeting with D'Arco in 1988, I requested D'Arco's assistance in the murder conspiracy.   Among the purposes of this murder conspiracy was maintaining the position of the association in fact enterprise charged in count one of the indictment. . . . [D]uring the period alleged in the indictment in the Eastern District of New York and elsewhere, I conspired with D'Arco and other persons associated with the enterprise in count one of the indictment to extort the property rights, including the right to do business freely of various carting companies operating on Long Island including the companies operated by Robert [K]ubecka and Jerry [K]ubecka . . . I did so by exercising the influence of the association in fact enterprise with which I was associated over the various car[t]ing companies, their trade associations, labor unions, holding jurisdiction over many of their employees.

(February 17, 1994 Avellino Plea Allocution, at 26-27).

Federico was arrested on January 27, 2003.   At that time he refused to provide pedigree information to the officers, and while he had no identification, he had approximately $2,000 in cash on his person.   (PSR ¶¶ 31-33).

Shortly after his arrest, blood samples were taken from Federico pursuant to a search warrant.   After the nurse obtained the samples, Federico stated "there was a lot of shooting that day, a lot of shots, there was a lot going on."   Federico's DNA was a match to DNA found at the Barstow/Kubecka murder scene.   (PSR ¶¶ 34-35).   After the government notified Federico that it intended to use the statements that he made after his blood was drawn in its case in chief at trial, Federico filed a motion to suppress the statement.   Specifically, Federico falsely claimed in a sworn affidavit that "FBI agents jumped upon and kicked me in my hernia causing me continual pain."   Federico also claimed "the FBI nurse took a huge hypodermic needle and jabbed and punctured my skin.   I immediately felt an incredible amount of pain from the hypodermic needle being inserted into my arm . . . The FBI nurse ripped into my vein with the hypodermic needle but then went all the way through the vein, which prevented the nurse from extracting my blood."   These statements were lies.   (PSR ¶¶ 37-39).

On March 22, 2004, after jury selection, Federico pleaded guilty to conspiracy to commit the murders in-aid-of racketeering of Robert Kubecka and Jerry Kubecka and perjury.   (PSR ¶¶ 1-2).   During his allocution, Federico explained that he had been ordered to murder Robert Kubecka and Barstow, which he did.   (PSR ¶ 36).

4

F.    Sentencing

On September 8, 2004, Federico was sentenced by Your Honor.   At that time, the Court found "clear obstruction of justice because he did submit a false affidavit" and because the defendant had failed to appear when subpoenaed before the grand jury. (September 8, 2004 Federico Sentencing Transcript, at 4).   At the sentencing hearing, the Court expressed concern that the agreed upon sentence of 15 years was too "soft," and explained that "he's gotten more consideration than he probably deserves in terms of possibly living with the hope that maybe he can see the light of day again."   (Id. at 6 – 7, 12).

At the sentencing hearing, the defendant's lawyer noted the defendant's health issues, telling the Court that "he collapsed in the middle of the trial.  He was taken to a hospital.   He was admitted.   The hospital confirmed that he has a blockage of one coronary artery and he had a long history of other problems, medical problems."   (Id. at 9; see also PSR ¶¶ 83, 86 noting that defendant suffered from a blockage in an artery, aortic valve stenosis and hypertension).

Before sentencing the defendant to the statutory maximum sentence of 15 years' imprisonment, to be followed by three years of supervised release, the Court stated:

> Mr. Federico, you're a cold blooded murderer.   You participated in the killing of someone who was cooperating with the authorities, trying to do the right thing, trying to be a good citizen and you gunned this person down in the prime of his life. . . . I want the record to be perfectly clear that if not for the government's insistence here . . . I would have insisted in going forward with our prosecution to serve a lesson, an abject lesson, that contract killers, you're not going to be given any consideration whatsoever in our judicial system.

(September 8, 2004 Federico Sentencing Transcript, at 10).   The Court also noted that it hoped that the defendant would never get out of jail.   (Id. at 11).

In addition to the instant convictions, the defendant's criminal history includes convictions for possession of burglar tools, unlawful entry, and two felony narcotics possession charges.   (PSR ¶¶ 64-67).

II.    Law

Title 18, United States Code, Section 3583(e)(1) authorizes a court to terminate a term of supervised release early if it is satisfied after considering the sentencing factors set forth in Title 18, United States Code, Section 3553(a) "that such action is warranted by the conduct of the defendant and in the interest of justice."   18 U.S.C. § 3583(e)(1); see also United States v. Lussier, 104 F.3d 32, 36 (2d Cir. 1997).   Early termination, however, is not justified solely because the defendant has complied with the terms of his supervised release. Lussier, 104 F.3d at 36; United States v. McKay, 352 F. Supp. 2d 359, 360-61 (E.D.N.Y. 2005)

5

(noting that "[m]odel prison conduct and full compliance with the terms of supervised release is what is expected of a person under the magnifying glass of supervised release and does not warrant early termination"); United States v. Rasco, 2000 WL 45438 (S.D.N.Y. Jan. 19, 2000). Rather, early discharge from supervised release is appropriate only "occasionally" to "account for new or unforeseen circumstances" not contemplated at the initial imposition of the sentence. United States v. Oliveri, 72 F. Supp. 3d 401, 403 (S.D.N.Y. 2014) (citing Lussier, 104 F.3d at 36).

III.    Analysis

Here, Federico's motion to terminate his supervised release should be denied because there have been no "changed circumstances" to justify the early termination of supervised release. The defendant contends that his term of supervised release should be terminated early due to his "poor and declining health." (Def. Ltr. at 2). The defendant's health issues do not constitute a changed circumstance that justify terminating his term of supervised release. As defense counsel at sentencing made clear, at that time the defendant suffered from heart issues. That he continues to have similar health issues does not warrant the requested relief. Additionally, the defendant has failed to explain how any aspect of his supervision unduly burdens him or how the continuation of his supervised release would negatively affect his health. The United States Probation Department has been very accommodating with the defendant. While the defendant is able to walk on his own, and does leave his home, Probation does not require the defendant to report to Probation's offices. Instead, the defendant's Probation officer visits his home approximately once a month, and speaks with the defendant by telephone approximately once a week. The defendant's health issues are not a changed circumstance that would warrant the early termination of his supervised release. See United States v. Louie, 2011 WL 601276, at *2 (D.N.J. Feb. 16, 2011) (denying defendant's motion to terminate supervised release where defendant had been convicted of the contract murder of a cooperating witness and finding that the health of the elderly defendant, who had suffered a heart attack, was "not an important factor to this decision" because the defendant was "eager for international travel").

Furthermore, although Federico has apparently complied with the terms of his supervised release, that does not justify early termination. See Lussier, 104 F.3d at 36. Federico has failed to present facts and circumstances that demonstrate the "exceptionally good behavior" referred to in Lussier. Federico alleges that he has complied with the conditions of his supervised release and has otherwise exhibited good behavior. (Def. Ltr. at 2). The defendant, however, does not explain how he has exemplified good behavior aside from abiding by the conditions of his supervised release. While it is commendable that Federico has complied with the terms of his supervision, such behavior is expected of a person on supervised release and does not constitute the "exceptional behavior" required by Lussier. See United States v. Medino, 17 F. Supp. 2d 245, 247 (S.D.N.Y. 1998) ("While [the defendant's] post-incarceration conduct is apparently unblemished, this alone cannot be sufficient reason to terminate the supervised release since, if it were, the exception would swallow the rule."). Good behavior is expected of defendants under post-release supervision and does not constitute a "special, extraordinary, or unforeseen circumstance that distinguishes

[the defendant] from other compliant defendants while on supervised release." United States v. Flores, 2010 WL 2573385, at *1 (S.D.N.Y. June 28, 2010).

Additionally, wishing to return to Italy, the country where he remained a fugitive from justice for years, to live out his final days does not warrant early termination. See e.g., United States v. Frost, 2012 WL 1228106, at *2 (S.D.N.Y. Apr. 11, 2012) (denying request for early termination of supervised release where defendant had complied with terms of supervision and wanted to travel abroad with his grandchildren); United States of America v. Lai, 458 F. Supp. 2d 177, 177 (S.D.N.Y. 2006) (denying early termination of supervised release for elderly defendant in failing health who hoped to return home to his family in Taiwan).

Moreover, the defendant committed an extraordinarily serious crime – he murdered two individuals, because of their cooperation with law enforcement against the Mafia. Early termination of the defendant's term of supervised release for such a serious crime is not in the interest of justice. See Louie, 2011 WL 601276, at *2 (explaining that "[t]he contract killing of a federal witness does not evoke feelings of mercy or generosity in a sentencing court, even 20 years after the crime" and finding that it was clear "that the shortening of [the defendant's term of supervised release to permit the luxuries of international travel would disserve the interest of justice"). Supervised release has been recognized as a legitimate part of the punitive element of a sentence, and given the seriousness of the defendant's offenses, it operates to continue to provide just punishment, deterrence, and protection to the public.

IV.    Conclusion

Because Federico has failed to establish any extraordinary conduct or unforeseen harsh consequences stemming from his supervised release that warrant its early termination, his request should be denied.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:  _____/s/_____
Nadia E. Moore
Assistant U.S. Attorney
(718) 254-6362

cc:    Murray Richman, Esq. (via ECF)

7